**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| **CYPRESS ACADEMY, INC. d/b/a** | § | |
| **PRODIGY ALL-STARS,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CAUSE NO. 3:24-cv-00119** |
| | § | |
| **KAREEM ALBRITTON,** | § | |
| | § | |
| *Defendant.* | § | |

**CYPRESS ACADEMY, INC. d/b/a PRODIGY ALL-STARS'**
**ORIGINAL COMPLAINT**

COME NOW, Plaintiff Cypress Academy, Inc. d/b/a Prodigy All-Stars ("Prodigy" or "Plaintiff") and files its Original Complaint against Defendant Kareem Albritton ("Albritton" or "Defendant") as follows:

**I.    PARTIES**

1.    Cypress Academy, Inc. d/b/a Prodigy All-Stars is a Texas corporation with its principal place of business in Houston, TX and is therefore a citizen of Texas.

2.    Albritton is an individual residing in Los Angeles, California, and therefore a citizen of California. He may be served with citation at **5555 Echo Street, Los Angeles, California 90042, 9037 Cattaraugus Ave., Los Angeles, CA 90034**, or wherever else he may be found.

**II.    JURISDICTION AND VENUE**

3.    This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. As alleged above, there is complete diversity of citizenship between the parties in this case. In addition, Plaintiff's damages in this lawsuit exceed $75,000.00, exclusive of interest and costs.

4.     This Court has personal jurisdiction over Defendant because this Complaint arises from Defendant's contacts with the State of Texas.

5.     Venue is proper under 28 U.S.C. § 1391(b)(2) because it is where a substantial part of the events or omissions giving rise to the claim occurred.

6.     More specifically, Albritton defamed Prodigy by falsely stating or implying that Prodigy's coaches were "grooming" athletes, supplying them with alcohol, and engaged in inappropriate relationships within the State of Texas. Albritton knew such coaches conduct their business in the State of Texas and deliver services to customers who reside in Galveston, Harris, Waller, and other surrounding counties. Albritton repeatedly engaged parents and athletes he knew were located in these counties by virtue of his previous position as a Prodigy coach. He contacted these persons specifically, by phone and over social media, in order to disparage and defame Prodigy, its leadership, and its coaches, and to interfere with Prodigy's business. Albritton took some of these actions while he was still in Texas immediately after his termination, before he was known to have moved to California. Albritton acted for the purpose of harming Prodigy, which he knew was a Texas-based operation, drawing nearly all of its customers from the counties surrounding its facilities, including Galveston County.

### III.     SUMMARY OF FACTUAL ALLEGATIONS

7.     In August 2023, Prodigy learned about and then substantiated complaints that one of its coaches, Kareem Albritton, had engaged in sexual misconduct with at least three underage athletes under his care and that he had supplied two more with illegal drugs, including cocaine. Albritton was immediately fired by Plaintiff and his conduct reported to the Harris County Sheriff, the Texas Family Services Abuse Hotline, US Center for SafeSport, and the U.S. All Star

Federation which, after its own investigation, banned Defendant from coaching anywhere in the United States. Albritton is currently the subject of an active criminal investigation.

8.       Albritton, angry with his firing, launched a series of false and defamatory attacks on Prodigy and disparaged its business. He harassed certain athletes, and he lied to parents about Prodigy's coaches and about the reasons for his termination. He coordinated an online campaign designed to upend Prodigy's business and manipulated at least one vulnerable child victim into spreading false stories about Prodigy's allegedly abusive conduct such as locking him in a closet without access to food or water. Albritton published false stories of and concerning Plaintiff to multiple parents and children. Many people credited these defamatory and disparaging statements in the face of Prodigy's unwillingness to comment publicly on his criminal acts. As a result, he harmed Prodigy's reputation and caused parents to withdraw their children from the gym, thereby negatively affecting Prodigy's revenue and reputation for which Plaintiff seeks redress. Prodigy's child athletes deserve a safe space to train. It has tried to put an end to Albritton's attacks but he has chosen to continue his behavior. Thus, judicial action is warranted.

## IV.    STATEMENT OF FACTS

### A.    Prodigy All-Stars establish a successful competitive cheer team program.

9.       Competitive cheer is a team-based performance sport, incorporating many elements of dance and gymnastics. The primary purpose of competitive cheer is to provide an opportunity for youth around the nation to compete with other cheer teams, rather than cheering in support of another sport. A typical cheer routine will last two and a half minutes, and feature stunts, jumps, and tumbling. The teams are then judged on the routine's difficulty and the team's execution of it.

10.      In the United States, most youth competitive cheer clubs, teams, and competitions fall under the purview of the U.S. All Star Federation ("USASF"). According to its promotional materials on their website, the USASF "credentials coaches, certifies legality officials and

sanctions events - all with the goal to provide the safest possible environment in which athletes may train and compete."[1]

11.     In 2007, Renee Basham ("Mrs. Basham") founded Prodigy, a family-owned, Texas-based gymnasium that offers competitive cheerleading and tumbling classes for children aged 3-19. Prodigy is affiliated with the USASF. Prodigy is typically home to local area children from Harris County, Galveston County, Waller County, and others, who train and compete in all star cheerleading.

12.     The landscape changed significantly for this small program in 2019, when one of Prodigy's teams brought home the world championship. After this victory, athletes from around the country, and the world, were asking to try out for their world championship teams, "Midnight" and "Blacklight." To respond to the new requests, Prodigy adopted certain established global practices in the sport. For example, Prodigy allowed athletes to try out and required their families to arrange "host family" accommodation if they wished their children to train and compete at this level. Each family choosing this arrangement was required to select their own host family. Aside from a limited introduction between interested parties, Prodigy played no role in selecting host families.

13.     The Bashams, through their family-owned and multi-generational business, have trained hundreds of thousands of athletes over the course of 42 years in business. Specific to the cheerleading activities, well over 15,000 athletes have trained at their facilities. Under Mrs. Basham's leadership, Prodigy grew. Today, Prodigy enjoys success across all levels in all manner of national competitions. It is home to the 2024 National Cheerleaders Association ("NCA")

---

[1]     The USASF's Restricted & Ineligible List is accessible at this link:
https://resources.usasfmembers.net/ineligible-list/?__hstc=138832364.58c2b452588baff208dff6733bde68a8.1712872153126.1713121688199.171338951613
5.4&__hssc=138832364.1.1713389516135&__hsfp=1530836998

National Champion team "Moonlight" and the 2023 World Champion team "Midnight." Along the way, Prodigy has rostered multiple children from out-of-state, all of whom successfully integrate with the team and contribute to its winning mentality.

**B.      Prodigy hires Kareem Albritton as a competitive cheer coach after verifying a clean background.**

14.      Kareem Albritton attended Oklahoma State University, where he was part of the school's national championship winning cheerleading team. Albritton joined a USASF-governed, Tulsa-based cheerleading facility in 2012. During his tenure in Tulsa, Albritton's teams won back-to-back-to-back NCA titles in 2016, 17, and 2018. He finished second at the World Championships and was heralded in the industry as one of the sport's top coaches.

15.      Mrs. Basham hired Albritton in 2018 for the express purpose of building Prodigy's premier competitive cheer team Midnight. He was incredibly successful in doing so. Just as he did in Tulsa, Albritton helped lead Midnight to titles in 2019 and 2023, with a national NCA championship in 2019—a year in which the team went undefeated at every competition. Albritton briefly left Prodigy during the COVID-19 shutdown, when he took a position at a gym in Illinois for the 2021-2022 season. He returned to Prodigy in March 2022, and in less than a year, Albritton's team again found success, winning the invitational competition "The Majors," as well as the World Championship.

16.      Before hiring Albritton at Prodigy, Mrs. Basham conducted the same pre-employment process that is conducted for every employee, including reference checks and a background screening. Albritton showed no previous offenses and came with glowing recommendations. He was applauded by his peers, previous employers, and families of the children he coached.

17. In 2021, to help make hiring processes more consistent among its member-clubs, the USASF launched its "Restricted & Ineligible" list. According to the USASF, the list "is a resource designed to keep the public informed" about individuals who have violated USASF policies or have engaged in misconduct and who "present a potential risk" to others affiliated with all-star cheerleading. In cheerleading parlance, when an individual is not on the USASF list, they are considered to have been "greenlit" by USASF and eligible to coach. Mrs. Basham confirmed that the USASF had greenlit Albritton and that his name did not appear on the USASF Restricted & Ineligible List. Only after doing so did Mrs. Basham re-hire Albritton as a coach at Prodigy on March 13, 2022. Mrs. Basham would not have re-hired Albritton had he not been greenlit by the USASF, where he had passed their pre-employment clearances, including a background screening.

**C.    Troubling complaints emerge about Albritton's relationships with minors at Prodigy so Mrs. Basham takes immediate action to terminate him.**

18. Albritton appeared to be a popular coach with a heavy following among athletes and parents alike. He helped lead several teams to various different titles before and during his tenure with Prodigy, including a world championship in 2023. The undefeated season for Prodigy's top world champion team in the 2018-2019 season was a rarity in the sport and a feat Prodigy was pleased to see so quickly after his hire. Such success would end abruptly and awfully, however.

19. On the afternoon of August 24, 2023, and again on the morning of August 25, 2023, three Prodigy employees separately approached Mrs. Basham to report that they had suspicions of (1) potential drug use by Albritton with minor and adult athletes and (2) a potentially inappropriate relationship between Albritton and a minor athlete, Doe 1. Mrs. Basham immediately began an investigation into the allegations, which expanded to include additional victims (Does 2-5).

20. Right away, Mrs. Basham and her compliance partner worked to file complaints with Harris County Sheriff, the Texas Family Services Abuse Hotline, and the USASF. The

allegations reported to law enforcement and USASF included what was known at the time, which was the alleged sexual abuse of minors, alleged sexual misconduct with athletes he directly coached, and alleged furnishing and consuming cocaine and alcohol with children as young as 15.

21.    Albritton never returned to Prodigy after the first allegations were reported on August 24. Throughout the day on August 24 and 25, 2023, Mrs. Basham and her compliance partner conducted over 30 witness interviews, including of athletes and employees, each of whom repeated and substantiated similar allegations against Albritton.

22.    Within 24 hours of hearing the allegations for the first time, Mrs. Basham, through her contracted compliance company, updated reports to the USASF, US Center for SafeSport, the Harris County Sheriff's Department and the Texas Family Abuse hotline. Additionally, Prodigy voluntarily submitted all interview and investigation materials to each entity for the sole purpose of fast-tracking a criminal investigation and USASF's coach credentialing decision. Mrs. Basham also held an emergency meeting with parents of the affected teams via Zoom. During the Zoom meeting, Mrs. Basham relayed what she had learned, provided contact information for relevant law enforcement agencies, encouraged parents to speak with their children directly to obtain more information, and suggested to the affected families that they file reports with law enforcement agencies as they deemed necessary, which resulted in additional filings. When Albritton was terminated, Prodigy published a letter to customers through social media addressing his exit.

23.    After this meeting, several minor athletes disclosed to their parents and, in some cases directly to Mrs. Basham, what they knew. The minors confirmed that he had used drugs in their presence and supplied them with cocaine. The children's stories were consistent and alarming. The children also expressed concern that Albritton was engaged in an inappropriate relationship with a high school athlete at Prodigy, Doe 1. Doe 1's parents told Mrs. Basham that,

after some discussion, Doe 1 had disclosed to them how Albritton would occasionally come to Doe 1's home and climb into Doe 1's bed at night. Doe 1 also admitted to being kissed by Albritton and to receiving jewelry from him. Doe 1 was only weeks into their senior year of high school and living away from their family, leaving them vulnerable to predators like Albritton.

24.     Though Albritton denied the allegations, Mrs. Basham terminated him for cause, including gross misconduct, the morning of August 26, 2023. Prodigy told Albritton directly that law enforcement was involved, that he had been reported to USASF,  that he was to have no contact with any Prodigy customers of any age and, specifically, no contact with minors. But Albritton's plan was different. Within an hour of his termination, Albritton began harassing various minor athletes, including Does 1-5, calling some of them repeatedly while sending text messages to others, asking for an immediate call. He attempted to contact dozens of athletes. Many of the athletes showed Mrs. Basham evidence of Albritton's repeated harassment, which was then provided to law enforcement agencies and the USASF. Prior to this incident, Prodigy had never received a complaint about Albritton.

**D.     After Prodigy acted to protect its athletes, Albritton responded by spreading lies about Prodigy and Mrs. Basham.**

25.     Having had little success in reaching the minor athletes or Prodigy staff immediately following his termination, Albritton began threatening Mrs. Basham and Prodigy's employees, culminating in an overnight rant against Mrs. Basham that led with an ominous warning.

26.     Albritton then sent Mrs. Basham a series of text messages in which he told her, "if you want to disregard me I can take the whole building down." Among the threatening messages, Albritton also sent Mrs. Basham a photo of two of Prodigy's former athletes, one of whom was a preschool and elementary coach, kissing. In his messages, Albritton implied that the two were engaged in an inappropriate relationship. Though it is believed Albritton was the only person with this photo, the same image was later shared by newly-created anonymous accounts on social media, claiming that it depicted ongoing child abuse at Prodigy. One such anonymous posting even received a recent boost from a former athlete's parent who remains very friendly with Albritton, and who was similarly asked to cease and desist from her defamatory behavior but refused to do so.



27.     In reality, the two athletes in the photo are both adults who simply met at Prodigy. Neither of the athletes were coached by each other, nor were they on the same roster when they competed. There was never a power imbalance between the two. Nonetheless, Prodigy reported it to the proper organizations out of an abundance of caution so that an independent investigation could be conducted by the USASF if they so desired. Notwithstanding this truth, Albritton manufactured a salacious and dangerous lie that was later reproduced solely to harm Prodigy.

28.     By September 1, 2024, Albritton attempted to contact Doe 1 and other minor athletes upwards of a dozen times per day, across phone, text, and various social media applications. The athletes came to Mrs. Basham expressing fear and apprehension because of the repeated contact. Athletes showed Mrs. Basham how they would block Albritton on one app or platform and he would call or message on another. Prodigy reported the continuing harassment to USASF in hopes that it would accelerate action on their part. In addition, Prodigy's compliance partner reached out to Albritton to demand he cease his conduct. When Albritton refused to stop reaching out to the children, and as a last resort, Prodigy's compliance partner contacted Albritton's sister—a highly-educated and trained mental health professional—for assistance. She appeared cooperative and attempted, unsuccessfully, to stop his dangerous contact with the children.

29.     Instead of quelling his behavior, however, Albritton became aggressive and belligerent. He increased his outreach to parents and athletes, attempting to manipulate them into believing he was wronged. Upon information and belief, he began telling parents of Prodigy athletes that his termination was simply the result of a misunderstanding, and that simply driving an athlete home could result in trouble. He told other cheer coaches that the stories about him were overblown. His primary story was that athletes had been caught drinking in his presence. He further

claimed to certain parents that Prodigy had "denied him of all insurance benefits" in order to solicit sympathy and money from them. All of this was false, of course. In response, however, several parents offered him financial assistance to assist with bills. Some parents gave Albritton money to pay for health costs that were already being covered by Prodigy's insurance.

30.     Of particular note, Albritton took to messaging parents, attacking a fellow world championship winning coach, falsely accusing him of wrongdoing that would cause him to lose his eligibility with USASF, including that he purchased alcohol for minors. One parent, after seeing a communication from Albritton that included their child, advised that the rumor Albritton was spreading was false and confirmed that she was the one who had provided alcohol to her adult daughter. Another athlete sent the compliance partner a text message telling her, "hey, I just heard that there's been allegations against [Coach] about buying [us] drinks … It was actually Kareem who bought it for us."

**E.     Albritton manipulates Doe 2, a troubled minor athlete, to do his bidding.**

31.     Undeterred by Prodigy's warnings and knowing that Prodigy would not address a criminal child abuse matter on social media, Albritton continued to escalate his predatory behavior using a minor and former athlete at Prodigy, Doe 2, as a social media spokesperson for his own agenda. Upon information and belief, Albritton incentivized Doe 2 to publish false claims of being (1) physically whipped by his coaches using a 3-foot braid, and (2) held against his will for 16 hours per day for five days. Doe 2 also claimed that he was held against his will in a locked room, without food, water, or access to outside communication for 12 hours per day for 5 days. None of this was true, an investigation quickly revealed.

32.     With respect to the braid, Prodigy learned that athletes had been engaged in light horseplay with each other, chasing each other a long synthetic hair braid that an athlete brought to practice. The braid had been used as a toy by the athletes and Albritton, who would clip the braid

to his hat to solicit laughter from the children. Neither Albritton, nor any other coach, violently whipped Doe 2, or saw anyone violently whip him. Those who witnessed the event that day did not believe it was aggressive in nature. Coaches, including Albritton, eventually told the athletes to "knock it off and get back to practice," which they promptly did.

33.     As for his claims that he was locked away, Doe 2 was merely asked to sit in an employee breakroom—that could not be locked from the exterior—during practice when he was suspended because he was not allowed to stay at his host family's home unattended after a series of behavioral issues, as described herein. The room had a bathroom, refrigerator, and sink (pictured below). Doe 2 could leave if he needed, and spoke with coaches as they came and went.

 

34.     When the push to create a false narrative went on, one Prodigy parent pleaded with Mrs. Basham about Albritton's continued contact with her young teenage child and advised that Albritton was pushing Doe 2 and several other athletes to make group calls to solicit kids, including her child, to be "Team Doe 2."  This child was asked by Doe 2 to lie in support of their former teammate and told "you're a victim too." The child declined to do so and instead asked their parent for help to end the conversation.

35.     Albritton is aware of the facts surrounding Doe 2's tenure at Prodigy and his struggles to adjust. More specifically, Albritton is aware that Doe 2 arrived at his first host family's

home in May 2022, at age 15. Early in his stay with Host Family 1, Doe 2 had stolen his mother's credit card, bought a plane ticket to Dallas, and traveled to see a romantic interest without permission.   In July 2022, Doe 2, stole alcohol from Host Family 1. At this time, Prodigy suspended Doe 2 and his coaches made him use the practice time to write his mother an apology letter. Typically, when a child is suspended, they are not permitted to attend practice but an exception was made for Doe 2 because Host Family 1 prohibited him from being in their home without supervision. Host Family 1 asked Doe 2 to leave so his mother found another arrangement.

36.     In August 2022, Host Family 2 allowed Doe 2 to move in. Regrettably, Host Family 2 had to move away so Doe 2's mother found yet another host family to take him in.

37.     In December 2022, Host Family 3 agreed to welcome Doe 2 into their home. As had become the pattern for Doe 2, however, he demonstrated a repeated failure to follow rules, general lack of respect, and was truant. The following year was a rocky one, with Doe 2 repeatedly finding himself at odds with teammates and coaches, skipping school on a regular basis. After he demonstrated continued difficulties with following Prodigy rules, he became increasingly aggressive towards teammates and coaches, oftentimes bullying his peers. Eventually, Host Family 3 ended their arrangement with Doe 2, at which time Doe 2 moved to a fourth and final host family.

38.     In December 2023, Mrs. Basham met with Doe 2 to advise that if his behavior did not improve, he would be dismissed from the team. Unfortunately, Doe 2's bad behavior continued well into January 2024. After another meeting to discuss his behavior on January 14, 2024, Mrs. Basham explained that he was going to be suspended for a week and that his conduct during suspension would inform how they would move forward. Doe 2 chose to mock his suspension on social media so, on January 23, 2024, Mrs. Basham told him that he would not be participating at an upcoming competition and that another athlete would be competing in his former position. In

response, Doe 2 stated that he was quitting and going home because he had no interest in serving as an alternate.

39.    Sadly, Doe 2's mother told Mrs. Basham that she could not take responsibility for Doe 2 and asked if he could remain in Houston to graduate high school. Prodigy told Doe 2's mother to contact Host Family 4 to discuss living arrangements as Prodigy had no direct involvement in that aspect of their athlete's lives. Host Family 4 similarly could not manage Doe 2's behavior, so they bought him a plane ticket home, at their own expense. Host Family 4 ultimately sent Doe 2 back to his mother after his mother repeatedly delayed agreeing to his return.

40.    Prodigy tried to provide a consistent space for a child who had little support elsewhere. Albritton knew this. After exhausting four host families and failing to adjust to what is required to be on a team, it was clear that Doe 2 was not going to be successful at Prodigy. Critically, Albritton's access to Doe 2 increased over this time period according to other athletes. Upon information and belief, Albritton targeted Doe 2 because of his history of behavioral issues, distance from his family, and other factors that render him particularly vulnerable to manipulation. Through law enforcement and Prodigy's compliance company's education and training, it is known that minor children who are in trouble with their host family are targeted by predators who will make sure to become a victim's safe and comforting space. Doe 2 fit this profile precisely.

41.    After his departure from Prodigy, Doe 2's mother demanded a "worlds release," which is a document that would permit an athlete to compete with another team after a certain point during the season. Releases are required by USASF. The rule is in place to limit "gym hopping" during the January and February months of the cheerleading calendar, when athletes are not always utilized in the team performance in the manner they would like. Prodigy re-iterated its worlds release policy to Doe 2's mother: no releases are granted for athletes who voluntarily vacate

their positions, particularly this late in the season. This news was not well-received by Doe 2, leaving him exposed to Albritton in this vulnerable time.

**F.    Albritton coordinates an uprising against Prodigy and launches a destructive social media campaign.**

42.    Since his termination, Albritton has escalated his efforts to defame Prodigy and interfere with their business affairs. Upon information and belief, Albritton contacted several Prodigy parents directly to disparage the company, its coaches, and to disrupt operations. More specifically, he began creating confusion among certain groups of parents by telling them, for example, that their child would have been promoted to the elite-level Midnight team had Prodigy not fired him. He also spread rumors regarding other coaches at Prodigy which made some parents question their child's safety at the gym. Of course, Albritton failed to disclose to the families the true reasons for his termination. Albritton intentionally contacted parents and children in Galveston County and other counties surrounding Harris, maximizing his reach and thereby the negative impact that his words would have on Prodigy, which operates primarily out of Houston, Texas.

43.    Seizing on the inaccurate information he was spreading, a few of the parents who had been close with Albritton believed the defamatory remarks and ultimately withdrew their children from the program.

44.    Around this same time frame, the USASF began receiving multiple reports filed against Prodigy in an effort to have it sanctioned. Each of the reports was ultimately closed with a determination that no violation had occurred. The USASF took no further action.

45.    Meanwhile, taking his campaign against Prodigy into the new year, Albritton turned towards a powerful tool: social media.

46.    Towards the end of January 2024, the false narrative that Albritton had spent months nurturing—including the rumors he had perpetuated about allegedly abusive coaches and

the photo he threatened to release—was making its way through online forums such as X (formerly known as Twitter), Facebook, and TikTok. Hate messages directed at Prodigy spiked dramatically, and received upwards of 100,000 views. Several anonymous accounts appeared, spreading messages once published by Albritton throughout the competitive cheerleading world.

47.     Unsurprisingly, at the end of January 2024, the USASF again reached out to Mrs. Basham to discuss a sudden escalation in reports against Prodigy. As it did at the of 2023, the USASF found no code violation and closed each report without taking any action against Prodigy.

48.     In February 2024, the mother of a current Prodigy athlete contacted Mrs. Basham to report that she had received a message from a former parent which had been sent to her by Albritton. In the message, Albritton falsely told her that a current coach at Prodigy is "grooming" children. The parent shared with Prodigy the information she received, but it was not evidence of any grooming, which Prodigy would have immediately reported to authorities as it did with Albritton. Part of the parent's messages are below.



49.     Similarly, another parent reported receiving a message from Albritton wherein he requested that she send messages like that on his behalf.

50.     Albritton's actions caused Prodigy to serve a letter demanding that he cease and desist his conduct, but that appears to have done little to dissuade him.

51.     Albritton leveraged Doe 2's anger with Prodigy and his knowledge of Doe 2's troubled history. Upon information and belief, Albritton connected Doe 2 with a new gym in a different state so that Doe 2 would be isolated from those who knew of Albritton's wrongful conduct while he continued to compete throughout his senior year. However, because Doe 2 exhibited behavioral issues and had abruptly quit Prodigy, Doe 2's was not permitted to obtain a "worlds release."

52.     In March 2024, Doe 2 sent a message to Mrs. Basham pleading for the release form. In his initial communication, Doe 2 admitted that "the way things ended weren't the best" and he "really [does] care about all of y'all."  Doe 2 also wrote an apology letter to Mrs. Basham with the help of his new coaches. In the letter, Doe 2 stated, "I hope this message finds you well. I am writing this to you to express my sincere regret for my recent actions. I want to express an apology not only to you but also to my past teammates, and the entire [Prodigy] program for any issues, troubles or inconveniences my behavior may have caused." But Mrs. Basham was prohibited from communicating with Doe 2. Believing instead that Mrs. Basham was simply being spiteful, Doe 2 sent an aggressive follow up which Prodigy has reason to believe Albritton assisted in creating. Since that time, Doe 2 appears to have joined forces with Albritton to spread misinformation about Prodigy.

53.     On March 19, 2024, Doe 2 posted a two-page statement to X (formerly Twitter), Instagram, and TikTok. The claims Doe 2 made against Prodigy in his statement were highly alarming, including claims of very serious child abuse and other allegations. Within minutes, Prodigy reported the allegations to law enforcement and the USASF. Law enforcement

communicated to Prodigy that they did not feel Doe 2 wrote the letter as the writing style did not match a letter he wrote to his mother. It is believed that Albritton and others assisted to prepare the statement. The posts have well over a million impressions and have been widely distributed in over a dozen countries and in multiple languages, further damaging Prodigy.

54.     In fact, at least three different Prodigy athletes have reported to Mrs. Basham that Albritton was coordinating with Doe 2. They confirmed that both Albritton and Doe 2—along with a former athlete's mother—were running fake social media accounts designed to harm Prodigy, and that Albritton and Doe 2 were separately asking current Prodigy athletes to lie for them. Between three known profiles and dozens of others, several million impressions of posts that are derogatory and posted for the sole intent to harm the company were posted on social media. Through this attack, during which financial losses to the company continue to mount, Prodigy continues to work each day with law enforcement in multiple states, supporting the active criminal investigations of Albritton and attempting to create a safe space for its athletes from future contact with him. Nonetheless, Albritton's efforts have begun to have the desired effect.

**G.      Albritton's lies on social media cause harm to Prodigy.**

55.     As a direct result of Albritton's campaign incited by Albritton, and taken up by Doe 2 and others, Prodigy, Mrs. Basham, its coaches, and its athletes quickly became the subject of violent threats. For example, one parent reported that she had been a victim of vandalism in a public parking lot and that her daughter was in fear of attending competitions because of the "trolls on Twitter."

---

**CYPRESS ACADEMY, INC. d/b/a PRODIGY ALL-STARS'
ORIGINAL COMPLAINT**

| | |
|---|---|
| Hi Renee,<br><br>Thank you for organizing this meeting for the Prodigy parents to get their questions answered. I would also like to know if the gym plans to address the threats & the hatred that is going around online. Specifically, Twitter accounts encouraging people to spit on & throw water on PA athletes at Worlds & Summit, threatening to burn down the gym....etc. | My personal vehicle was vandalized in the grocery store parking lot yesterday when someone tore apart my PA sticker and stuck the pieces of shredded sticker all over the back of my car. Sadly, the athletes are the ones suffering from this even though they have had nothing to do with any of it. As an adult, I understand that trolls on Twitter are just that - but my daughter is truly nervous and scared to be at The Summit with her PA gear on for fear that someone might hurt her. |

56.     Unsurprisingly, more parents began to leave Prodigy. The exodus of families has negatively impacted ongoing operations and caused financial harm to Prodigy.

57.     In addition, Mrs. Basham's email address fell victim to a cyber-attack, suddenly receiving an influx of hundreds of spam emails. The same day, Prodigy's compliance partner similarly suffered a DDOS attack causing its website to crash. It is believed to be a direct result of Albritton's efforts. All data from the coordinated attacks was turned over to law enforcement.

**H.     Though law enforcement disclosed other complaints about Albritton, no issues were raised in his background and he remained eligible for Prodigy to hire.**

58.     After reporting Albritton, in the fall of 2023, Prodigy was shocked to learn that Albritton had previously been accused of sexual misconduct with athletes in multiple states, including Texas, Oklahoma, and Arkansas. Prodigy used a reputable third party to perform a nationwide background check, but it returned without hits. There was no indication that Albritton has ever been arrested or previously convicted of any crimes before working with Prodigy.

59.     Fortunately, in large part because of Prodigy's diligence in reporting and following up on its reports, USASF has permanently banned Albritton as of April 12, 2024 for his actions in 2023. The notice of suspension issued by USASF (below) reveals that the complaints were sustained as to Prodigy's complaints.

Mr. Albritton,

On August 29, 2023, you were notified that USASF received a report with allegations that, if substantiated, may constitute a violation of one or more USASF policies.

A third-party investigator was contracted by USASF to investigate the allegations in an impartial manner and has concluded their investigation into the allegations that you violated the USASF PRC, Code of Conduct and/or the USASF Abuse Prevention Policies.

This comprehensive investigation has resulted in the following findings:

1.  *Allegation the Respondent violated 2022-2023 USASF Code of Conduct & Compliance, Article 2: Prohibited Conduct, Section 2.10: Other Inappropriate Conduct. D. Inappropriate Physical Contact: An Adult Member violates this Code by engaging in inappropriate physical contact with a Member when there is a Power Imbalance. Such inappropriate contact includes, but is not limited to, intentionally: 3. Kissing a Member. The allegation is* **SUSTAINED.**

2.  *Allegation the Respondent violated 2022-2023 USASF Code of Conduct & Compliance, Article 2: Prohibited Conduct, Section 2.6: Emotional and Physical Misconduct. C. Physical Misconduct, 2b. Non-contact violations (in part) providing, assisting in providing or condoning the consumption of illegal drugs or non-prescribed medications to another. The allegation is* **SUSTAINED.**

The USASF Response & Resolution Committee (RRC) reviewed the findings and recommendations and voted to accept the recommended Sanction:

• **Effective April 12, 2024, your membership will be revoked indefinitely with the USASF.**

60.     Albritton is under active criminal investigation into the remaining allegations of sexual assault and abuse against minors. Mrs. Basham continues to cooperate with each law enforcement agency involved and as the investigations proceed.

## V.     CAUSES OF ACTION

### A.     Count I—Defamation Per Se

61.     Albritton was discussing Plaintiff when he stated and/or implied:

    a.     Prodigy knew two of its athletes, including a coach, were engaged in an inappropriate relationship;

    b.     Prodigy denied him of all insurance benefits;

    c.     Prodigy coaches abused minor athletes;

    d.     A Prodigy coach purchased alcohol for minors; and

    e.     A Prodigy coach is "grooming" athletes.

62.     Albritton intentionally communicated each of the above statements to others, in person and across various media.  Such statements were made to gain notoriety.

63. Each of Albritton's statements, as described above, is a statement of fact, or alternatively, an opinion that implies it is based upon the existence of undisclosed facts.

64. Each of Albritton's statements, as described above, concerns Plaintiff.

65. Each of Albritton's statements, as described above, is materially false.

66. Each of Albritton's statements, as described above, is defamatory because it exposes Plaintiff to contempt, tends to harm Plaintiff's reputation and/or discourages others from associating or dealing with Plaintiff.

67. Albritton made each of the above statements with knowledge that each statement was false or with reckless disregard for the truth.

68. Each of Albritton's statements proximately caused actual injury to Plaintiff's reputation and good standing in the community, Plaintiff's current and future revenue, and Plaintiff has incurred and continues to incur out of pocket expenses that exceed the minimum jurisdiction of this court as a proximate result.

69. The statements and implications were defamatory per se because they were of a nature tending to injure Prodigy in its office, profession, and occupation. The statements ascribed to another certain conduct and characteristics that have adversely affected Prodigy's fitness for the proper conduct of its lawful business, trade or profession.

## B. Count II—Business Disparagement

70. Albritton published false and disparaging information about Plaintiff as described in this Complaint, including in Paragraph 58. He repeatedly contacted parents of Prodigy athletes to spread false information regarding his termination, coaches' behavior, treatment of athletes, and roster decisions. He did so with malice and without privilege.

71.     Each of Albritton's acts and statements proximately caused actual injury to Plaintiff, including a loss of current and future revenue, as well as out of pocket expenses that exceed the minimum jurisdiction of this court as a proximate result.

**C.     Count III—Tortious Interference with Existing Business Relationships**

72.     Albritton willfully and intentionally published false and disparaging information about Plaintiff as described herein, including in Paragraph 58.

73.     Albritton willfully and intentionally contacted athletes as well as parents of athletes in order to convey false and disparaging information about Plaintiff and its employees.

74.     Albritton's act of contacting athletes and parents of athletes to convey false and disparaging information proximately caused actual injury to Plaintiff's reputation and good standing in the community, Plaintiff's current and future revenue, and Plaintiff has incurred and continues to incur out of pocket expenses that exceed the minimum jurisdiction of this court as a proximate result.

## VI.   <u>DAMAGES</u>

75.     Plaintiff has incurred damages proximately or directly caused by the acts or omissions of Defendant set out above, which include, but are not limited to:

   a.      Injury to Plaintiff's reputation;

   b.      Injury to Plaintiff's reputation and good standing in the community;

   c.      Injury to Plaintiff's good standing in the community, and

   d.      Out of pocket expenses.

76.     Plaintiff is further entitled to punitive or exemplary damages as may be shown for the malicious acts and/or omissions of Defendant.

## VII.   <u>DEMAND FOR JURY TRIAL</u>

77.   Plaintiff requests a trial by jury of twelve (12).

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer herein, and that upon final trial Plaintiff has judgment and recovers, as follows:

a) Plaintiff's actual and compensatory damages in an amount within the jurisdiction limits of this Court;

b) Plaintiff's costs of Court;

c) Exemplary or punitive damages in an amount within the jurisdictional limits of this Court;

d) Pre and post judgment interest on all such amounts at the maximum legal rate until such amounts are paid to Plaintiff; and

e) Such other and further relief, both at law or in equity, to which Plaintiff may show itself to be justly entitled.

Respectfully submitted,

By: */s/ Charles L. Babcock*

      **JACKSON WALKER LLP**
      CHARLES L. BABCOCK
      *Attorney-in-Charge*
      cbabcock@jw.com
      Texas State Bar No. 01479500
      Federal ID No. 10982
      1401 McKinney Street, Suite 1900
      Houston, TX 77010
      T: (713) 752-4200
      F: (713) 752-4221

      ***Attorneys for Cypress Academy, Inc. d/b/a Prodigy All-Stars***

**OF COUNSEL:**

**JACKSON WALKER LLP**
JONATHAN D. NEERMAN
Texas State Bar No. 24037165
Federal ID No. 592947
jneerman@jw.com
2323 Ross Avenue, Suite 600
Dallas, TX 75201
T: (214) 953-5664
F: (214) 661-6899
GABRIELA M. BARAKE
Texas State Bar No. 24099794
Federal ID No. 3006704
gbarake@jw.com
1401 McKinney Street, Suite 1900
Houston, TX 77010
T: (713) 752-4200
F: (713) 752-4221